E-FILED
Thursday, 23 September, 2004  02:21:58 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

HAROLD R. FREEMAN,

    Plaintiff,

vs.                                                                             01-CV-3160

DANIEL BOSSE, et al.,

    Defendants.

## Order

    The plaintiff filed this 42 U.S.C. § 1983 case while incarcerated in the Illinois Department of Corrections ("IDOC"). He has since been paroled.

    The events occurred during the plaintiff's incarceration at Logan Correction Center, from December, 1997 through about March 5, 1999. The remaining claims are: 1) the deduction of all the plaintiff's trust funds left him to suffer in prison conditions that violated the Eighth Amendment; 2) the plaintiff's right of access to the courts was violated; and 3) the plaintiff was transferred in retaliation for filing a grievance.

    The defendants' motion for summary judgment (d/e 73) is before the court and is granted for the reasons below.

## Undisputed Facts

    The court adopts the undisputed facts set forth by the defendants (d/e 73), to the extent they are material and not disputed by the plaintiff.

    1. The plaintiff was incarcerated in Logan Correctional Center ("Logan") from December 5, 1997, to about March 5, 1999.

    2. The plaintiff received hygiene items upon his arrival in the IDOC in 1997. He maintains he received a small hotel-size bar of soap, a 2 inch toothbrush, and the "very smallest of all tubes of toothpaste." (Plaintiff's Resp. to Def.'s Motion for Summary Judgment, d/e 80, p. 6)(hereinafter referred to as d/e 80).

    3. The plaintiff admits he purchased hygiene items when he had money in his account.

    4. The plaintiff alleges that from mid-1998 through his transfer from Logan in 1999 he needed hygiene items and was unable to purchase them due to lack of funds in his trust fund

1

account.

 5.  The plaintiff obtained soap from his cell mate and other inmates from time to time during his incarceration at Logan.

 6.  The plaintiff never went without taking a shower during his incarceration at Logan.

 7.  The plaintiff admitted in his deposition that, on occasion, he went a couple of days at a time without soap, and two or three days at a time without toothpaste.

 8.  The plaintiff purchased items from the commissary on January 14, 1998, February 18, 1998, June 17, 1998, July 22, 1998, July 30, 1998, August 19, 1998, August 26, 1998, September 3, 1998, and September 16, 1998, totaling $143.66.

 9.  On July 22, 1998, the plaintiff purchased $36.99 worth of items from the commissary including cigarettes, tobacco, deodorant, shampoo, pens, paper, "Murray's," razors, ivory soap, toothbrush holder, laundry soap, toothpaste, write outs, and pens.

 10.  On July 30, 1998, the plaintiff signed for commissary items which included soap, petroleum jelly, write outs, pens, toothbrush and cigarettes.

 11.  From January, 1998, until the plaintiff's transfer out of Logan, his trust fund account never showed a zero balance.[1]  The court notes however, that the balance was less than $1.00 several times during this time frame.

 12. Family members and/or friends made deposits into the plaintiff's trust account, intended to help the plaintiff purchase hygiene items.  In some instances, before the plaintiff could shop at the commissary, his trust account was all but depleted to pay for his copying and mailing expenses.[2]

 13.  On January 8, 1999, the plaintiff filed a grievance challenging the deductions that depleted his account, making it impossible for him to purchase needed items at the commissary.

---

[1] The proposed fact states that a zero balance showed only once, on June 26, 2001, during the time period from January, 1998 through June, 2001.  The relevant time period here is during the plaintiff's incarceration at Logan, from December, 1997, to March 5, 1999.

[2] The parties do not propose this as an undisputed fact, but that is the plaintiff's main claim, and the court accepts it as true for purposes of this order.  The plaintiff cites as an example June, 1998, when his account had a balance of $114.81 (from payroll and money orders) and $109.20 was deducted for "library," leaving him only five cents. (Complaint, d/e 9, Inmate Transaction Statement Attached).

14. On or about February 17, 1999, the plaintiff was approved for transfer to Pinckneyville Correctional Center. The plaintiff did not request the transfer.

15. On or about March 5, 1999, the plaintiff was transferred from Logan to Shawnee Correctional Center, rather than to Pinckneyville Correctional Center.[3]

16. The plaintiff believes he was transferred in retaliation for his January 8th grievance.

17. On February 20, 1999, the plaintiff received a care package. The plaintiff maintains it contained only a two-inch toothbrush and the "smallest bar of hotel soap that could possibly be imagined." (d/e 80 p. 2).

18. On February 20, 1999, the plaintiff's property included 28 "noodles," four "chili's," one beans, two jiffy mix, 3 packages cakes, four bags chips, three rice, one tea, three cookies, one hot sauce, four popcorn, seven sausage, one bag candy, six pops, ½ bag coffee, 14 cigarettes, two combs, four deodorant sticks, two hair brushes, one hair conditioner, five or six soap bars, one powder, one baby oil, one toothpaste, one toothbrush and holder, corn pads, two medicated cream, three razors, and A&D ointment, among other items.[4]

19. Deductions from the plaintiff's trust fund account were taken throughout his incarceration at Logan for his legal mail and copying expenses.[5] These deductions often left little money in the plaintiff's account for the purchase of items from the commissary.

20. The plaintiff was never denied the right to send any mail to the court, to an attorney, or to the Administrative Review Board.

21. The plaintiff's mail addressed to "grass roots" organizations such as the NAACP and the ACLU was returned because of insufficient funds.[6]

22. The plaintiff believes that these "grass roots" organizations could have helped the

---

[3]Apparently the plaintiff's original transfer to Pinckneyville was put on hold for an investigation into a prison disturbance. The plaintiff was apparently exonerated of involvement, and his transfer was changed to Shawnee instead of Pinckneyville, for reasons not in the record.

[4]The plaintiff responds he had to beg for these from other inmates, or these items were given to him by other inmates. He maintains that he begged for the items in light of his impending transfer to another prison because he feared the inmates at the new prison would not be so helpful.

[5]For purposes of this order, it is not necessary to recount all the deductions. They are set forth in Defendants Proposed Facts, paragraphs 8-12 (d/e 73).

[6]For purposes of this order, the court accepts these allegations as true.

appeal of his criminal conviction.

23. An appellate defender handled the plaintiff's appeal of his criminal conviction.

24. The plaintiff got a full hearing in the state appellate court on his criminal conviction.

25. One of the criminal charges against the plaintiff was vacated on appeal.

26. The plaintiff's appeal to the Illinois Supreme Court was denied.

27. The plaintiff also filed a federal habeas corpus action.

28. The plaintiff was never denied the right to make legal copies.

## Analysis

*Eighth Amendment*

The plaintiff alleges that he was forced to choose between essential personal hygiene items and legal supplies necessary to access the courts. However, no reasonable inference arises from the record to support those allegations. The plaintiff has produced no evidence that he endured for any extended time without soap, toothpaste, toothbrush, and other essential hygiene items. Defendants have produced ample evidence to show that the plaintiff possessed sufficient quantities of these items, along with extras. At most, by the plaintiff's own testimony, he may have gone without soap or toothpaste for a few days at a time, and was able to buy or borrow what he needed most of the time. This is not enough to raise an inference that the deprivations the plaintiff suffered were "sufficiently serious" to amount to cruel and unusual punishment under the Eighth Amendment. *See, e.g., Davenport v. DeRobertis*, 844 F.2d 1310, 1316-1317 (7th Cir. 1988)(one shower per week found constitutional for inmates confined to segregation where sinks were provided in the cells); *Harris v. Fleming*, 839 F.2d 1232 (7th Cir. 1988)(no constitutional deprivation where plaintiff averred he had no toilet paper for 5 days, no soap, toothpaste or toothbrush for 10 days and cell was filthy and roach-infested).

The plaintiff challenges the depletion of his account to pay for copying and mailing costs, particularly from money given by family members and friends for the plaintiff to use at the commissary. However, the plaintiff has no constitutional right (as he acknowledges) to have defendants subsidize his litigation. *Johnson v. Daley*, 339 F.2d 582, 586 (7th Cir. 2003)("Although prisoners enjoy a fundamental right of access to the courts . . . there is no right of *subsidized* access"); *Lewis v. Sullivan*, 279 F.3d 526, 528 (7th Cir. 2002). The defendants did not violate the constitution by depleting his account to pay for those costs, regardless of the money's origin. As discussed above, the constitutional question is whether the plaintiff suffered cruel and unusual conditions because of his low account balance. There is no evidence that he did.

*Access to the Courts*

The plaintiff alleged in his Complaint (liberally construed) that the deductions from his account left him without funds to pursue post-conviction challenges.

The defendants correctly assert that the plaintiff cannot seek damages for his conviction until the conviction is set aside. *Hoard v. Reddy*, 175 F.3d 531 (7th Cir. 1999)(no exception to *Heck* for § 1983 damages for denial of access to post-conviction proceedings).[7] However, the court need not decide whether *Heck* bars the plaintiff's access claim, because the plaintiff has offered no evidence that he was denied access to the courts. He does not dispute that his mail to the courts or to attorneys was never withheld, regardless of his trust account balance. Furthermore, he was represented by defense counsel on his appeal, which he does not dispute was partially successful. His only argument is that his appeal might have been more successful if he had been able to enlist the aid of organizations like the NAACP and ACLU. He alleges that his mail to these kinds of organizations was returned because of insufficient funds in his account. The constitutional right of access to the courts does not encompass the right to garner public support for one's litigation. An access to the courts claim only arises if the plaintiff suffered "actual injury" from the inability to pursue a nonfrivolous claim. *Lewis v. Casey*, 116 S.Ct. 2174, 2179-80 (1996); *May v. Sheahan*, 226 F.3d 876, 883 (7th Cir. 2000); *Walters v. Edgar*, 163 F.3d 430, 434 (7th Cir. 1998)(actual injury occurs when plaintiff blocked from litigating a nonfrivolous case). No evidence suggests the plaintiff suffered any "actual injury," or was blocked from pursuing a legal claim.

*Retaliation*

The plaintiff argues that he was transferred to Shawnee Correctional Center on March 5, 1999, in retaliation for his January 8, 1999 grievance.[8] He concludes this for three reasons: 1) he asked for a "hardship transfer" to East Moline 2-3 weeks before he filed the grievance, but his request was denied on the grounds he was "appropriately placed" at Logan; 2) he did not ask to be transferred to Pinckneyville or Shawnee; and 3) he was approved for transfer to Pinckneyville about one month after his January 8th grievance.

These events are insufficient to permit an inference of retaliation. To succeed on a retaliation claim, the plaintiff must "establish that his protected conduct was a motivating factor

---

[7]The parties agree that the plaintiff was at least partially successful in his post-conviction appeal, but there are no further details in the record. How this affects the *Heck* analysis need not be addressed, as the plaintiff has no evidence to support his claim.

[8]The defendants assert that the transfer was "lateral"–a transfer between prisons with the same security designations. The court does not adopt this fact as undisputed because it was not asserted as an undisputed fact in the defendants' motion (d/e 73). The court therefore does not address the defendants' argument that the plaintiff suffered no injury from the transfer.

5

behind [the defendants' actions] . . . [t]he ultimate question is whether events would have transpired differently absent the retaliatory motive . . ." *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996).

That the plaintiff's grievance was filed about one month before plaintiff's transfer was approved does not create a reasonable inference of retaliation. A one-month lag between the two events is not very suspicious. Further, the plaintiff started complaining about the deductions in June, 1998, so the defendants were aware of the issue well before the grievance was even filed. (Plaintiff's Dep. pp. 18-33).[9] Even if the timing could be considered suspicious, that alone does not create an inference of retaliation. *See Smith v. Dunn*, 368 F.3d 705, 708 (7th Cir. 2004)(suspicious timing not enough to create inference of adverse employment action in retaliation for protected speech). Similarly, that the plaintiff did not request the transfer lends nothing to his case–there is no evidence to suggest that transfers are typically initiated at a prisoner's request only.

As to the plaintiff's assertion that he requested a transfer to East Moline two or three weeks before he filed the January 8th grievance, he cites to nothing in the record to support this assertion. In any event, the denial of his requested transfer to East Moline does not allow a reasonable inference that his approved transfer to Pinckneyville about two months later was motivated by retaliation. Prisoners have no constitutional right to incarceration in a particular prison or to avoid transfers, even to prisons outside the state. *Meachum v. Fano*, 427 U.S. 215, 225 (1976); *see also Thomas v. Ramos*, 130 F.3d 754, 760 (7th Cir. 1997)(prisoner has no liberty interest in remaining in general population or avoiding transfer to another prison). Absent evidence of an unconstitutional motive, courts cannot interfere with prison officials' discretion in deciding where to house inmates. "'[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.'" *Turner v, Safley*, 482 U.S. 78, 84 (1987), *quoting Procunier v. Martinez*, 416 U.S. 396, 405 (1974). "'[P]rison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Id.* at 89, *quoting Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128 (1977).

In sum, the plaintiff has not supported his allegations with sufficient evidence for a jury to find for him on any of his claims. Summary judgment must therefore be granted to the defendants. *Jones v. Johnson*, 26 F.3d 727, 728 (7th Cir. 1994)("Summary judgement is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgement must be granted.").

IT IS THEREFORE ORDERED:

1. The defendant's motion for summary judgment is granted (d/e 73). The clerk of the court is directed to enter judgment in favor of the defendants and against the

---

[9]The transfer form signed by defendant Bosse states "bed space needs" as the reason for transfer. (d/e 74, Ex. 12).

plaintiff. All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs. The clerk is directed to vacate the final pretrial and trial dates.

2. If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $255.00 appellate filing fee irrespective of the outcome of the appeal.

Entered this   22   Day of    September                  , 2004.

                                             **s\Harold A. Baker**

                                             HAROLD A. BAKER
                                    UNITED STATES DISTRICT JUDGE